UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
ANTHONY BATTISTI,

                        Plaintiff,            <u>MEMORANDUM & ORDER</u>
                                              10-CV-4139(JS)(AYS)

            -against-

KATHLEEN RICE, ADA MICHAEL CANTY,
ADA CAROLYN KELLY, ADAs JOHN DOE 1-5,
DETECTIVE JASON GAERTNER, SERGEANT
ROBERT GALGANO, OFFICERS JOHN DOE 1-5,
THE COUNTY OF NASSAU, and TIMOTHY
GERSBECK,

                        Defendants.[1]
------------------------------------X
APPEARANCES
For Plaintiff:          Neil S. Torczyner, Esq.
                        Steven J. Harfenist, Esq.
                        Harfenist Kraut & Perlstein, LLP
                        3000 Marcus Avenue, 2d Floor East
                        Lake Success, New York 11042


For the County          Donna A. Napolitano, Esq.
Defendants:             Daniel James Evers, Esq.
                        Berkman, Henoch, Peterson,
                        Peddy & Fenchel, P.C.
                        100 Garden City Plaza
                        Garden City, New York 11530

                        Liora M. Ben-Sorek, Esq.
                        Nassau County Attorney's Office
                        One West Street
                        Mineola, NY 11501

---

[1] The Clerk of the Court is directed to TERMINATE Kathleen Rice
and the County of Nassau as parties to this action.  On
November 16, 2016, the claims against these Defendants were
voluntarily dismissed.  (Stip. & Order, Docket Entry 58.)

```
For Timothy
Gersbeck:              Timothy Gersbeck, pro se[2]
                       54 Balsam Lane
                       Levittown, NY 11756
```

SEYBERT, District Judge:

This case involves claims for false arrest and malicious prosecution by Plaintiff Anthony Battisti ("Plaintiff") against Defendants Assistant District Attorney Michael Canty ("ADA Canty"), Assistant District Attorney Carolyn Kelly ("ADA Kelly"), Detective Jason Gaertner ("Detective Gaertner"), Sergeant Robert Galgano ("Sergeant Galgano") (collectively the "County Defendants"), and Timothy Gersbeck ("Gersbeck"). Currently pending before the Court is the County Defendants' motion for summary judgment. (Defs.' Mot., Docket Entry 52.) For the following reasons, the County Defendants' motion is GRANTED.

BACKGROUND

I.   Factual Background[3]

     A.   The Assault and Preliminary Investigation

On January 23, 2009, Plaintiff's ex-wife, Patricia Battisti, was assaulted outside her home in Franklin Square, New

---

[2] The County Defendants notified the Court that Mr. Gersbeck's address has changed. The Clerk of the Court is directed to update his address as indicated above.

[3] The following material facts are drawn from the County Defendants' Local Civil Rule 56.1 Statement and Plaintiff's Local Civil Rule 56.1 Counterstatement. Any relevant factual disputes are noted. All internal quotation marks and citations have been omitted.

York.   (Defs.' 56.1 Stmt., Docket Entry 52-2, ¶¶ 35, 38, 51.)

After the attack, Detective Gaertner, a detective with the Nassau

County Police Department, arrived at the scene.   (Defs.' 56.1 Stmt.

¶ 35.) He learned that the suspected assailant, Gersbeck, had been

apprehended by two men after he fled the scene of the assault.

(Defs.' 56.1 Stmt. ¶ 36.)   At least two people at the scene, Brian

Dashner  and  Sergeant  Joseph  Pizzimenti,  heard  Gersbeck  say

something to the effect of "You should go back to the house before

someone finishes the job" and "I was hired by Tony."  (Defs.' 56.1

Stmt. ¶ 37; Supporting Dep., Defs.' Ex. C, Docket Entry 52-6, at 2;

Pizzimenti Crim. Tr., Defs.' Ex. PPP, Docket Entry 52-71, 1226:10-

20.)[4]

        After Gersbeck was arrested, Detective Gaertner searched

the area and directed officers to call the Crime Scene Unit to

gather evidence.  (Defs.' 56.1 Stmt. ¶¶ 40-42.)  Detective Gaertner

discovered two blue latex gloves on the path Gersbeck took to flee

the scene.   (Defs.' 56.1 Stmt. ¶ 43.)   Detective Gaertner also

instructed that a black Jeep belonging to Gersbeck be impounded to

preserve any evidence inside.  (Defs.' 56.1 Stmt. ¶ 45.)  At some

point during the preliminary stages of the investigation, Sergeant

---

[4] With the exception of transcripts, the Court will use the
pagination assigned by the Electronic Case Filing System when
referring to the exhibits.   The Court will refer to deposition
transcripts ("Dep. Tr."), trial testimony ("Crim. Tr.") and
testimony at administrative proceedings ("Admin. Tr.") by the
transcript page and line number.

Galgano arrived, although the parties dispute whether he provided any direction to Detective Gaertner or others regarding the conduct of the investigation. (Defs.' 56.1 Stmt. ¶ 44; Pl.'s 56.1 Counterstmt., Docket Entry 54-1, ¶ 44.)

Next, Detective Gaertner, Sergeant Galgano, and another officer went to Winthrop Hospital to speak to Ms. Battisti and photograph a wound she suffered to her neck. (Defs.' 56.1 Stmt. ¶ 46.) Ms. Battisti stated that she was opening the front door of her home after a shopping trip when "an unknown male put his hand around her mouth, stabbed her in the back of her neck with a sharp instrument, told her that 'if you tell anyone, I'll kill your son and daughter,' pushed her to the ground and ran away." (Defs.' 56.1 Stmt. ¶ 47.) Afterward, she identified the individual as Timothy Gersbeck. (Defs.' 56.1 Stmt. ¶ 47.) When they returned to the scene, "a sharpened screwdriver was found inside a pair of white latex gloves" near where Gersbeck was apprehended, which was later determined to be the weapon used in the attack. (Defs.' 56.1 Stmt. ¶¶ 48-49.)

B. Gersbeck's Initial Statements

Gersbeck was taken to the police precinct for questioning and gave a statement to Detective Ronald Rispoli ("Detective Rispoli"). (Defs.' 56.1 Stmt. ¶¶ 51-52.) Gersbeck admitted that he "put stuff out of order," and the statement went through between six and eight drafts. (Pl.'s 56.1 Counterstmt.

¶ 52; Gersbeck Dep. Tr., Defs.' Ex. CCC, Docket Entry 52-58, 19:20-20:3.) The County Defendants allege that several drafts were prepared because "Gersbeck kept talking, told Rispoli things out of order/context, left some information out, and kept remembering other details." (Defs.' 56.1 Stmt. ¶ 53.) The parties dispute whether Gersbeck read the final statement before signing it. (Defs.' 56.1 Stmt. ¶ 52; Pl.'s 56.1 Counterstmt. ¶ 52.) Afterward, Detective Gaertner reviewed the statement and spoke with Gersbeck as part of the investigation, including to obtain Gersbeck's consent to search his impounded Jeep and cell phone. (Defs.' 56.1 Stmt. ¶¶ 54, 56.) During this time, Plaintiff's attorney called Sergeant Galgano and asked if Plaintiff should report to the precinct, and he responded that it was not necessary for several reasons, including because "the investigation was in the preliminary stages . . . and there was not enough at that point to look at Plaintiff as a suspect or take him into custody." (Defs.' 56.1 Stmt. ¶ 58.)

On January 24, 2009 at approximately 4:00 a.m., Detective Rispoli and Detective Gaertner took Gersbeck to the Nassau County District Attorney's Office ("NCDAO") for a videotaped statement. (Defs.' 56.1 Stmt. ¶ 59.) The parties agree that at this point, Gersbeck had "been up for about twenty-four hours with no sleep and was confused and nervous." (Defs.' 56.1 Stmt. ¶ 60; Pl.'s 56.1 Counterstmt. ¶ 60.) Gersbeck said that he

met Plaintiff in 2002 or 2003 when they worked together at a container company and they "became friends because they both were interested in racing stock cars."[5] (Defs.' 56.1 Stmt. ¶ 63.) He said that Plaintiff was an officer with the New York City Police Department ("NYPD") and began talking about killing his ex-wife because he did not want to continue to make child support payments of approximately $3,000 a month. (Defs.' 56.1 Stmt. ¶¶ 64, 65, 67.) Gersbeck said Plaintiff specifically asked him in 2008 if he would kill Ms. Battisti if Plaintiff paid him. (Defs.' 56.1 Stmt. ¶ 68.) He also stated that when he was incarcerated in Nassau County Correctional Center in 2007, Plaintiff visited him and told him that if Gersbeck did not formulate a plan to kill Ms. Battisti, Plaintiff would make sure he remained in jail. (Defs.' 56.1 Stmt. ¶¶ 66, 119.) He said that Plaintiff "got rid" of several traffic tickets for him, which Plaintiff later used as leverage to try to get him to kill Ms. Battisti. (Defs.' 56.1 Stmt. ¶¶ 69-70.)

---

[5] Plaintiff objects to the Court's consideration of Gersbeck's statements to the NCDAO on hearsay grounds. (See Pl.'s Counterstmt. ¶¶ 63-110.) However, they are not being offered to "prove the truth of the matter asserted." FED. R. EVID. 801(c)(2). As set forth more fully infra, the statements are being offered to show the information ascertained by the County Defendants during the investigation which formed the basis for the determination of probable cause. See, e.g., Sandor v. Safe Horizon, Inc., No. 08-CV-4636, 2011 WL 115295, at *7 (E.D.N.Y. Jan. 13, 2011) (holding that statements offered to show the information available to managers when they decided not to promote plaintiff which demonstrated their state of mind were not hearsay in employment discrimination case). Accordingly, Plaintiff's objections are disregarded.

During 2008 and 2009, he said that Plaintiff mentioned killing Ms. Battisti approximately fifty times, and on a few occasions, discussed methods of killing Ms. Battisti at either Plaintiff's mother's house or the Franklin Square Fire Department firehouse. (Defs.' 56.1 Stmt. ¶¶ 72, 74, 75.) Gersbeck stated that, on one occasion, Plaintiff told him he had a shotgun Gersbeck could use to kill Ms. Battisti. (Defs.' 56.1 Stmt. ¶ 76.) Gersbeck said that Plaintiff offered him $5,000 to kill Ms. Battisti, and that in March 2008, Plaintiff made several payments to him in cash totaling $2,500 as partial payment for killing her. (Defs.' 56.1 Stmt. ¶¶ 79-80.) Gersbeck said that Plaintiff received the money from his cousin, the owner of Royal Carting Company. (Defs.' Stmt. ¶ 80.) After he received the money, Gersbeck stated that Plaintiff began harassing him to kill Ms. Battisti, but Plaintiff was "stalling and just wanted to give the money back." (Defs.' 56.1 Stmt. ¶ 82.) When he tried to give it back, he said that Plaintiff would not let him, and told him that he would get Gersbeck's warrants and tickets reinstated. (Defs.' 56.1 Stmt. ¶¶ 83-84.)

Later, in September 2008, Gersbeck said Plaintiff "got really serious about killing [her]" after Ms. Battisti sought reimbursement for $4,000 to $5,000 in medical expenses for the couple's children. (Defs.' 56.1 Stmt. ¶¶ 85-86.) Around Christmas, Gersbeck saw Ms. Battisti at a gas station in her neighborhood, and he followed her home with the intention of

killing her. (Defs.' 56.1 Stmt. ¶ 90.) However, he saw an ambulance in the neighborhood and noticed that the volunteer fire department (including Plaintiff) was arriving on the scene. (Defs.' 56.1 Stmt. ¶¶ 90-91.) Gersbeck said that he told Plaintiff he was going to kill Ms. Battisti, but Plaintiff told him to leave and asked him to meet at the firehouse later; when they met, Plaintiff allegedly made an additional $300 payment for the murder. (Defs.' 56.1 Stmt. ¶ 91.)

Gersbeck said that about a week and a half before the attack, he met Plaintiff at the fire house to discuss killing Ms. Battisti, and Plaintiff indicated that he wanted to "get it done." (Defs.' 56.1 Stmt. ¶¶ 92-93; Gersbeck Video Stmt., Defs.' Ex. H, Docket Entry 52-11, at 7.) Gersbeck also mentioned that he saw a "blonde female police officer" at the firehouse during the meeting with Plaintiff. (Defs.' 56.1 Stmt. ¶ 113.)

On January 23, 2009, Gersbeck said that Plaintiff called him and asked if they were "on" for that day. (Defs.' 56.1 Stmt. ¶ 95.) When Gersbeck asked what he meant, he said that Plaintiff stated that he was going upstate with his children and Ms. Battisti would be home alone. (Defs.' 56.1 Stmt. ¶ 95.) Later that afternoon, Gersbeck said that Plaintiff called him to tell him to wait until after 7:00 p.m. to go to Ms. Battisti's home because he was leaving later than expected to travel upstate. (Defs.' 56.1 Stmt. ¶ 96.) Gersbeck told Plaintiff he needed money for gas, and

Plaintiff told him he would leave $20 outside his mother's house, which according to Gersbeck, he never retrieved. (Defs.' 56.1 Stmt. ¶ 97.)

Gersbeck stated that he arrived at Ms. Battisti's home around 5:45 p.m. and waited for her to come home. (Defs.' 56.1 Stmt. ¶¶ 98-99.) When she arrived, Gersbeck put on a pair of blue surgical gloves and approached her while she was walking to the front door. (Defs.' 56.1 Stmt. ¶¶ 101-02.) After he came up behind her, he "accidentally stepped on her leg and caused her to fall into the front door" and after the front door opened, she fell onto the floor.[6] (Defs.' 56.1 Stmt. ¶ 102.) At this point, Gersbeck said he became scared and started to run away, and as he was running, he took off the blue gloves and dropped them. (Defs.' 56.1 Stmt. ¶¶ 103-04.) Gersbeck also explained that at that time, he was carrying a small screwdriver in a pair of white surgical gloves in his pocket that were given to him by Plaintiff. (Defs.' 56.1 Stmt. ¶ 105.) Gersbeck maintained that he had left the screwdriver inside the gloves in the console of his car since

---

[6] The transcript of the 911 call indicates that Ms. Battisti told the dispatcher that "someone stabbed [her] in the back of the neck," and that he said "he was going to kill [her] son and daughter." (Defs.' 56.1 Stmt. ¶ 130; Pl.'s 56.1 Counterstmt. ¶ 130; Defs.' Ex. T, Docket Entry 52-23, at 1-4.) When the dispatcher asked if she knew the attacker, she said "I don't know my ex-husband probably could of sent someone here." (Defs.' 56.1 Stmt. ¶ 130; Pl.'s 56.1 Counterstmt. ¶ 130; 911 Transcript, Defs.' Ex. T, Docket Entry 52-23, at 1-4.)

receiving it from Plaintiff approximately four months earlier. (Defs.' 56.1 Stmt. ¶ 105.) He also stated that Plaintiff sharpened the screwdriver and placed it inside the gloves, and he never removed the screwdriver from the gloves during the months it was in his car. (Defs.' 56.1 Stmt. ¶¶ 106-07.) He claimed that when he approached Ms. Battisti he "never took the screwdriver out of his pocket, did not have any weapon in his hand, never put the screwdriver to her neck, and was just going to scare her." (Defs.' 56.1 Stmt. ¶ 108.) Gersbeck subsequently testified that he told the truth when gave the statement to Detective Rispoli and during the videotaped confession. (Defs.' 56.1 Stmt. ¶ 62; Gersbeck Dep. Tr. 113:18-23.)

Gersbeck was charged and arraigned for Attempted Murder in the Second Degree, Criminal Possession of a Weapon in the Third Degree, and Petit Larceny. (Defs.' 56.1 Stmt. ¶ 114.)

C. The Investigation and Indictments

Detective Gaertner attempted to verify the information provided by Gersbeck. Along with Detective Galgano and Detective Gregory Celantano ("Detective Celantano"), he went to Plaintiff's mother's home and discovered "a $20 bill under a Belgium block at the top of the driveway," which was photographed and taken into evidence. (Defs.' 56.1 Stmt. ¶ 116.) Detective Gaertner confirmed that the owners of Royal Carting Company, from whom Plaintiff allegedly obtained Gersbeck's fee, were Plaintiff's relatives.

10

(Defs.' 56.1 Stmt. ¶ 117.) He learned that Plaintiff visited
Gersbeck while he was incarcerated at NCCC in 2007. (Defs.' 56.1
Stmt. ¶ 119.) Further, video footage corroborated that Plaintiff
and Gersbeck met on January 16, 2009 at the fire house and a female
police officer was there as well. (Defs.' 56.1 Stmt. ¶ 120.)
Records also showed that an EZ Pass registered to Plaintiff crossed
the Throgs Neck Bridge into the Bronx at approximately 7:04 p.m.
the day of the attack and that Plaintiff had withdrawn $7,000 from
his bank account in February 2008, a month before Gersbeck claimed
to have received $2,500 from Plaintiff to kill Ms. Battisti.
(Defs.' 56.1 Stmt. ¶¶ 80, 126, 128; Pl.'s 56.1 Counterstmt. ¶ 126.)
The parties dispute whether either the NCDAO or Detective Gaertner
confirmed that Gersbeck had previous traffic tickets which he
alleged Plaintiff threatened to reinstate if he did not kill Ms.
Battisti. (Defs.' 56.1 Stmt. ¶¶ 69, 143; Pl.'s Counterstmt.
¶ 143.)

Detective Gaertner became aware that Family Court
proceedings between Plaintiff and Ms. Battisti were initiated
during the fall of 2008, which was consistent with Gersbeck's
earlier statement that in September 2008, Plaintiff "got really
serious about killing [her]." (Defs.' 56.1 Stmt. ¶¶ 85, 147; Pl.'s
56.1 Counterstmt. ¶ 147; Gaertner Dep. Tr., Defs.' Ex. DDD, Docket
Entry 52-59, 135:16-136:2.) The NCDAO obtained cell phone records
and cell site data which confirmed that Gersbeck and Plaintiff had

11

communicated on the day of the attack around the times Gersbeck indicated. (Defs.' 56.1 Stmt. ¶¶ 150-51.) Statements were obtained from Franklin Square volunteer firefighters regarding conversations with Plaintiff the night of the attack, including a statement indicating that Plaintiff told one individual that he was upstate, when according to cell site data, he was in Queens, and another statement indicating that after that call, he said "I am home with the kids what do you mean" even though he already knew about the incident at his ex-wife's home. (Defs.' 56.1 Stmt. ¶¶ 206-07.) Records from the Franklin Square Fire House also confirmed that the Fire Department (and Plaintiff) responded to a call on Ms. Battisti's street on December 15, 2008, consistent with Gersbeck's statement that he followed Ms. Battisti home with the intention of killing her before Christmas, but left after speaking to Plaintiff. (Defs.' 56.1 Stmt. ¶¶ 90-91, 162.)

Detective Gaertner also learned additional information about the nature of Ms. Battisti and Plaintiff's relationship after he accompanied Ms. Battisti to Family Court to file a family offense petition. (Defs.' 56.1 Stmt. ¶ 121.) The petition stated that Plaintiff allegedly stalked Ms. Battisti and contacted her regularly after she requested that he stop. (Defs.' 56.1 Stmt. ¶ 121; Family Offense Pet., Defs.' Ex. N, Docket Entry 52-17, at 1.) It also stated that Plaintiff had threatened to kill her in 2003 and told her he would be able to get away with it. (Family

Offense Pet. at 3-4.)  Thereafter, Ms. Battisti filed for an Order
of Protection.  (Family Offense Pet. at 3-4.)  Detective Gaertner
and NCDAO subsequently received a copy of Plaintiff's Internal
Affairs Bureau ("IAB") file which also contained information about
allegations of domestic violence.  (Defs.' 56.1 Stmt. ¶ 127.)

        In February 2009, the NCDAO entered into a debriefing
agreement with Gersbeck and conducted several debriefing sessions
with him.  (Defs.' 56.1 Stmt. ¶ 133.)  Detective Gaertner was
notified that the NCDAO was taking over the investigation and,
afterward, periodically assisted NCDAO with its investigation.
(Defs.' 56.1 Stmt. ¶¶ 135-36; Gaertner Dep. Tr. 61:2-10.)  At one
of the debriefing sessions, Gersbeck learned that Ms. Battisti had
sustained an injury to the back of her neck during the attack. At
that point, Gersbeck contradicted his earlier statements and said
that he had the screwdriver in his hand when he approached her and
that he tried to stab her.  (Defs.' 56.1 Stmt. ¶ 138; Gaertner
Dep. Tr. 82:5-88:12; Gersbeck Admin. Tr., Defs.' Ex. WWW, Docket
Entry 52-78, 228:8-16.)  At another session, Gersbeck for the first
time mentioned a video of his family which Plaintiff used to
threaten him and intimidate him.  (Defs.' 56.1 Stmt. ¶ 139;
Gersbeck Dep. Tr. 104:20-106:9.)  Gersbeck stated that Plaintiff
showed him the video, and he was scared that Plaintiff would harm

his family if he did not kill Ms. Battisti.[7]  (Defs.' 56.1 Stmt. ¶ 139; Gersbeck Dep. Tr. 104:20-106:9.)

The NCDAO obtained DNA samples from Plaintiff and Gersbeck, and the medical examiner detected Gersbeck's DNA and DNA from an unknown individual on the white gloves that held the screwdriver used in the attack.[8]  (Defs.' 56.1 Stmt. ¶ 152; Defs.' Ex. EE, Docket Entry 52-34, at 4-5.)  Subsequent testing determined that Plaintiff's DNA did not match the unknown DNA, and he was excluded as the source of that DNA.  (Defs.' 56.1 Stmt. ¶ 154; Pl.'s 56.1 Counterstmt. ¶ 154; Feb. 16, 2009 Police Dep't Rep. at 5.)

On February 24, 2009, Gersbeck wrote a letter to his girlfriend, Deanna Kani (the "Belle Letter").  (Defs.' 56.1 Stmt. ¶ 156.)  In the letter, Gersbeck discussed several interactions with Plaintiff, and stated: (1) "But back to the Anthony stuff I

---

[7] During his deposition, Gersbeck admitted that he did not mention the video during the videotaped statement because he was "confused and nervous."  (Defs.' 56.1 Stmt. ¶ 111; Gersbeck Dep. Tr. 18:8-19:8.)  He also said he thought he told Detective Rispoli about the video when he gave his written statement but could not remember for sure.  (Defs.' 56.1 Stmt. ¶ 112; Gersbeck Dep. Tr. 19:9-20:3.)

[8] Plaintiff alleges that the County Defendants' Exhibit EE "does not identify which gloves were tested."  (Pl.'s 56.1 Counterstmt. ¶ 152.)  However, a report from the Forensic Evidence Bureau indicates that a "white glove has been accepted . . . for immediate analysis," and a "pair of blue gloves" w[as] rejected."  (Feb. 16, 2009 Police Dep't Rep., Defs.' Ex. EE, Docket Entry 52-34, at 4 (emphasis in original).)

will start with the money[.]  I sold [h]im one of my race motors
and [h]e still owes me $5200.00 bucks[.]  So now that Im [sic]
working with the system they said that money is money for hire the
way it went down but [h]e actually owes me more then [sic] that
and I'm still out of the money and the motor."; (2) "He showed me
two different tapes of [h]im following Melissa and the girls when
she was going back and forth from school and [h]er job[.]  Followed
[h]er to Miller Ale House a few times and which not like I cared
about [h]er but still didn't want anything to [h]appen to [h]er
[b]ecause of me."; and (3) "[I]t sounds like it was nothing but
the two times [h]e pulled his gun on me definetly [sic] made it
very serious . . . so I really didn't know what to do anymore and
[h]ad no where to turn . . . ."  (Belle Ltr., Defs.' Ex. GG, Docket
Entry 52-36, at 1.)

          The parties dispute when the police department and the
NCDAO became aware of the content of the Belle Letter.  Ms. Kani
testified at Gersbeck's trial that she sent a copy of the letter
to Detective Gaertner or his partner in April 2009.  (Defs.' 56.1
Stmt. ¶ 156; Pl.'s 56.1 Counterstmt. ¶ 156; Kani Crim. Tr., Defs.'
Ex. KKK, Docket Entry 52-66, 1571:8-16, 1575:12-20.)  At his
deposition, Detective Gaertner testified that he learned in
February or March 2009 that Gersbeck was writing to his girlfriend
from ADA St. Bernard, but he did not read the letter at that time.
(Defs.' 56.1 Stmt. ¶ 158; Gaertner Dep. Tr. 93:18-94:24.)  ADA

Canty, who took over the investigation from ADA St. Bernard in June 2009, testified that he did not read the letter until December 2009 when he was preparing the case for trial.[9] (Defs.' 56.1 Stmt. ¶¶ 165, 183, 210.) However, Detective Gaertner testified that he read the letter before Gersbeck was indicted in August 2009 and he received the letter from ADA Canty. (Defs.' 56.1 Stmt. ¶ 183; Pl.'s 56.1 Counterstmt. ¶ 183.)

The Nassau County Police Department's Forensic Evidence Bureau analyzed the screwdriver used by Gersbeck and "determined that it was a Craftsman #2 screwdriver, had toolmarks on the base consistent with a gripping tool with opposing jaws, [and] had marks on the tip consistent with a grinding or abrasive tool . . . ." (Defs.' 56.1 Stmt. ¶ 161.) Afterward, Detective Gaertner and Sergeant Galgano executed a search warrant on Plaintiff's garage and collected, among other items, "26 screwdrivers, 24 gripping devices, 1 pair of pliers, 2 files, a bench vice, [and] a free standing grinder." (Defs.' 56.1 Stmt. ¶ 170.) Subsequent analysis revealed that the marks on the screwdriver could not be matched to any tools seized from Plaintiff's garage. (Defs.' 56.1 Stmt. ¶ 174.) Specifically, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") concluded that "the sharpened tip of the

---

[9] Plaintiff alleges by implication that ADA Canty did not present the Belle Letter to the grand jury, since he testified he did not read it until December 2009, several months after the grand jury. (Pl.'s 56.1 Counterstmt. ¶ 277.)

screwdriver was made with an abrading type tool . . . such as a grinding wheel, disc or belt that left no toolmarks of value for comparison," however "the impressions on the screwdriver handle were not made by the tools seized at Plaintiff's garage." (Defs.' 56.1 Stmt. ¶ 212.) The NCDAO later received records indicating that Plaintiff purchased a set of Craftsman screwdrivers approximately ten months before Ms. Battisti was attacked. (Defs.' 56.1 Stmt. ¶ 208.)

On August 3, 2009, Gersbeck was indicted for Attempted Murder in the First Degree, Conspiracy in the Second Degree, Assault in the Second Degree, and Criminal Possession of a Weapon in the Third Degree. (Defs.' 56.1 Stmt. ¶ 176.) After the indictment, ADA Canty met with Gersbeck and asked him about the inconsistencies between his statements; Gersbeck responded that he was "confused" and "made some mistakes" but during his deposition, he said "the testimony that [he] gave later to ADA Canty was more accurate." (Defs.' 56.1 Stmt. ¶¶ 178-79; Gersbeck Dep. Tr. 130:18-132:7.) During these sessions (and contrary to some of his previous statements), Gersbeck said that he did use the sharpened screwdriver to stab Ms. Battisti and again mentioned the threatening video of his family. (Defs.' 56.1 Stmt. ¶¶ 180-81.) Thereafter, Gersbeck signed a cooperation agreement for his testimony against Plaintiff, and in exchange, the NCDAO agreed to

ask the judge to sentence Gersbeck to eight years.  (Defs.' 56.1 Stmt. ¶ 182.)

On September 3, 2009, Plaintiff was indicted on charges of Attempted Murder in the First Degree, Conspiracy in the Second Degree, Assault in the Second Degree, and Criminal Possession of a Weapon in the Fourth Degree.  (Defs.' 56.1 Stmt. ¶ 190.)  A warrant was issued for his arrest, and Detective Gaertner and Sergeant Galgano participated in the arrest.  (Defs.' 56.1 Stmt. ¶ 191.)  While in the squad car, the County Defendants allege that Plaintiff stated "I threw away my life.  I threw away 17 and a half years," and Detective Gaertner wrote the statement down immediately.  (Defs.' 56.1 Stmt. ¶¶ 195-96; Gaertner Dep. Tr. at 113:13-15; Defs.' Ex. SS, Docket Entry 52-48, at 1.)  Sergeant Galgano recalled that he said "I wasted 17 and a half years of my life."  (Pl.'s 56.1 Counterstmt. ¶ 195; Galgano Dep. Tr., Defs.' Ex. EEE, Docket Entry 52-60, 13:15-21.)  Plaintiff alleges that he actually said "I can't believe this is the way they treat me after seventeen and a half years on this job."  (Pl.'s 56.1 Counterstmt. ¶ 195; Battisti Dep. Tr., Ex. VVV, Docket Entry 52-77, 235:5-8.)  Plaintiff denied making this statement in subsequent proceedings, and it was later confirmed that Plaintiff had been a NYPD officer for approximately seventeen and a half years at that time.  (Pl.'s 56.1 Counterstmt. ¶¶ 195, 197.)

D.    Trial Preparation and Trial

At some point between Plaintiff's indictment and trial and after a request from Plaintiff's criminal counsel, Gersbeck's vehicle was searched and a grinder was located in the trunk of the vehicle.  (Defs.' 56.1 Stmt. ¶ 214.)  Detective Gaertner testified that the grinder was never sent to ATF for comparison testing because "it was explained to [him] by a district attorney that it would not be possible."  (Defs.' 56.1 Stmt. ¶¶ 215; Pl.'s 56.1 Stmt. ¶ 215; Gaertner Dep. Tr. 75:22-76:2.)  Plaintiff alleges that none of the detectives or ADAs "ever attempted to compare the sharpened screwdriver . . . with the grinding tools that were in the very vehicle Gersbeck drove to [Ms. Battisti's] house."  (Pl.'s 56.1 Counterstmt. ¶ 271.)  The County Defendants allege that "the ATF's report . . . concluded that the screwdriver had no toolmarks for comparison to any grinder (whether Plaintiff's or Gersbeck's)."  (Defs.' 56.1 Counterstmt., Docket Entry 56-1, ¶ 271.)

Immediately prior to trial, ADA Kelly took over the case against Plaintiff and prepared the case for trial.  (Defs.' 56.1 Stmt. ¶¶ 217, 234.)  During her meetings with Gersbeck, he told that when he approached Ms. Battisti, he tried to stab her but then "the door opened and she fell into the house."  (Pl.'s 56.1 Counterstmt. ¶ 222; Kelly Dep. Tr., Ex. GGG, Docket Entry 52-62, 26:19-27:5.)  He also mentioned the threatening video of his

family. (Defs.' 56.1 Stmt. ¶ 220.)  When ADA Kelly asked Gersbeck about his statements in the Belle Letter, he explained that "he didn't want his girlfriend to know that he had done this . . . [t]hat he accepted money in exchange for trying to kill someone." (Kelly Dep. Tr. 34:18-24; Defs.' 56.1 Stmt. ¶ 224.)  ADA Kelly also spoke with Joe Massone, Gersbeck's boss, who conveyed to her that Gersbeck told him about the plan to kill Ms. Battisti. (Defs.' 56.1 Stmt. ¶ 228; Kelly Dep. Tr. 15:17-16:11.)

From May 17, 2010 to June 2, 2010, ADA Kelly conducted Plaintiff's trial, and the jury acquitted Plaintiff on all charges. (Defs.' 56.1 Stmt. ¶¶ 234, 237.)  In November 2011, a NYPD administrative proceeding was held, after which the Assistant Deputy Commissioner found it was more likely than not that Plaintiff: (1) "with the intent to cause of the death of another person . . . attempted to cause the death of Patricia Battisti by entering into an agreement with Timothy Gersbeck whereby Timothy Gersbeck would cause the death of Patricia Battisti in exchange for a sum of United States currency"; (2) "while acting in concert with and or aiding and abetting and being aided and abetted by Timothy Gersbeck . . . with the intent to cause physical injury to another person, caused such injury to Patricia Battisti by stabbing her in the neck with a sharp metal object"; (3) while acting in concert with and or aiding and abetting and being aided and abetted by Timothy Gersbeck . . . possessed a sharp metal object with the

intent to use it unlawfully against Patricia Battisti"; and (4) being "wrongfully in possession of a Department radio previously reported missing." (Defs.' Ex. BBB, Docket Entry 52-57, at 2-3.) He pleaded guilty to two other charges and was found not guilty on one charge. (Defs.' Ex. BBB, at 3.) Plaintiff was subsequently terminated from the NYPD. (Defs.' 56.1 Stmt. ¶ 243.)

II. <u>Procedural History</u>

Plaintiff commenced this lawsuit on September 10, 2010 against ADA Canty, ADA Kelly, Detective Gaertner, Sergeant Galgano, Gersbeck, Kathleen Rice ("Rice"), unidentified ADAs, unidentified officers, and the County of Nassau ("the County"). (Compl., Docket Entry 1, at 1.) The Complaint asserted five causes of action: (1) false arrest against Detective Gaertner, Sergeant Galgano, ADA Canty, ADA Kelly, Gersbeck, unknown officers and unknown ADAs; (2) malicious prosecution against Detective Gaertner, Sergeant Galgano, ADA Canty, ADA Kelly, and Gersbeck; (3) violation of his fourteenth amendment rights due to a unconstitutional "perp walk" policy against the County; (4) defamation against Rice; and (5) interference with his parental rights against ADA Kelly, ADA Canty and unknown ADAs. (Compl. ¶¶ 107-163.) Specifically, Plaintiff alleged that Sergeant Galgano, Detective Gaertner, and Gersbeck "testified falsely before the grand jury," (Compl. ¶ 112); ADA Canty and ADAs John Doe 1-5 "knowingly offered perjured testimony before the grand

jury," (Compl. ¶ 113); "[t]he criminal prosecution was commenced despite . . . [the County Defendants'] knowledge that [Plaintiff] was not involved in Gersbeck's attack on Patricia and that probable cause for the initiation and continuation of the prosecution did not exist," (Compl. ¶ 123); and the County Defendants "continued to participate in the criminal prosecution, even after they learned that there was no evidence linking [Plaintiff] to Gersbeck's actions against Patricia and that Gersbeck was lying about [Plaintiff's] involvement in order to obtain a more favorable plea bargain." (Compl. ¶ 124.) Plaintiff sought $32,000,000 in compensatory damages, as well as exemplary damages, punitive damages, and attorneys' fees. (Compl. at 27.) On December 6, 2010, the County Defendants answered and asserted cross-claims against Gersbeck. (Answer, Docket Entry 7.)

After engaging in discovery, Plaintiff agreed to discontinue the third, fourth, and fifth causes of action, and the County and Rice were terminated as defendants. (See Pl.'s Ltr., Docket Entry 44; See Stip. & Order.) On January 7, 2016, the County Defendants moved for summary judgment on the remaining claims for false arrest and malicious prosecution. (Defs.' Mot., Docket Entry 52.) Plaintiff filed his opposition brief on February 19, 2016, and the County Defendants filed their reply brief on March 18, 2016. (Pl.'s Opp., Docket Entry 54; Defs.' Reply, Docket Entry 56.)

DISCUSSION

I.  Legal Standard

Summary judgment will be granted where the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A genuine factual issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed 2d 202 (1986).  In determining whether an award of summary judgment is appropriate, the Court considers the "pleadings, deposition testimony, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits. Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there are no genuine issues of material fact.  Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994).  Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial."  Giglio v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at *4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted).  Conclusory allegations or denials will not defeat summary judgment.  Id.  However, in reviewing the summary judgment record, "'the court is required to resolve all ambiguities and

draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

## II. False Arrest

The County Defendants argue that Plaintiff's false arrest claim must be dismissed because Plaintiff "was arrested pursuant to a Superior Court arrest warrant issued after a grand jury indictment." (Defs.' Br., Docket Entry 52-1, at 15.) The Court agrees. A false arrest claim must be dismissed when the "arrest is made pursuant to a warrant issued after a grand jury indictment." Stukes v. City of N.Y., No. 13-CV-6166, 2015 WL 1246542, at *11 (E.D.N.Y. Mar. 17, 2015) (quoting Sargent v. Cty. of Nassau, No. 04-CV-4274, 2007 WL 778437, at *7 (E.D.N.Y. Mar. 13, 2007)). The proper claim is one for malicious prosecution. See Stukes, 2015 WL 1246542, at *11. The parties agree that Plaintiff was arrested pursuant to a "Superior Court Warrant of Arrest" after he was indicted on September 3, 2009. (Defs.' 56.1 Stmt. ¶ 190; Pl.'s 56.1 Counterstmt. ¶ 190.) In light of the foregoing, and Plaintiff's concession that the false arrest claim is "mis-styled," Plaintiff's false arrest claim is DISMISSED.[10]

---

[10] Plaintiff requests that the Court consider the "allegations of having presented false evidence to the Grand Jury and/or

## III. Malicious Prosecution[11]

The County Defendants argue that they are entitled to summary judgment on the malicious prosecution claim for the following reasons: (1) Plaintiff has not demonstrated that ADA Kelly or Sergeant Galgano were personally involved; (2) Detective Gaertner and Sergeant Galgano did not initiate or continue a criminal proceeding against Plaintiff; (3) there was probable cause to indict, arrest, and prosecute Plaintiff; and (4) Plaintiff has failed to show that any Defendant acted with malice. (Defs.' Br. at 15.)

---

withholding exculpatory evidence from the Grand Jury under a theory of [m]alicious [p]rosecution as pleaded in the second cause of action." (Pl.'s Opp. at 19.) The Court will address these allegations in its discussion of the malicious prosecution claim.

[11] With respect to Plaintiff's malicious prosecution claim against Gersbeck, Plaintiff has failed to demonstrate that he was acting under color of state law, which is required to maintain an action under § 1983. See Lee v. Law Office of Kim & Bae, P.C., 530 F. App'x 9, 9-10 (2d Cir. 2013) (quoting Ciambriello v. Cty. of Nassau, 292 F.3d 307, 324 (2d Cir. 2002) (internal citations omitted) ("A conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity. To support a claim against a private party on a § 1983 conspiracy theory, a plaintiff must show (1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."). Thus, the malicious prosecution claim against Gersbeck is DISMISSED. The Court will only address the allegations against ADA Canty, ADA Kelly, Detective Gaertner, and Sergeant Galgano.

Plaintiff advances two theories.  <u>First</u>, Plaintiff alleges that the presentation of the case to the grand jury was improper.  (Pl.'s Opp. at 19.)  Specifically, Plaintiff argues that two acts by ADA Canty—-the presentation of Gersbeck's testimony and his failure to present the Belle Letter to the grand jury--are sufficient to rebut the presumption of probable cause arising from the indictment.  (Pl.'s Opp. at 21.)  He maintains that "multiple versions of Gersbeck's testimony put the Defendants on notice that Gersbeck was not telling the truth" and that "he had materially changed his story."  (Pl.'s Opp. at 22.)  He also argues that ADA Canty's "failure to present exculpatory evidence to a grand jury eviscerates the presumption of probable cause which attaches to a grand jury indictment."  (Pl.'s Opp. at 21.)  <u>Second</u>, Plaintiff alleges that any probable cause that may have been established by the time of the grand jury dissipated before trial.  (Pl.'s Opp. at 19-20.)  Plaintiff argues that "many of the lies told by Gersbeck were dispelled after he began 'working with the system' while other evidence which could have served to corroborate Gersbeck's story or exonerate the Plaintiff were never pursued."  (Pl.'s Opp. at 26; Belle Ltr. at 1.)  Plaintiff points to several facts which he claims destroyed probable cause before trial, including Gersbeck's admission that he did have the screwdriver in his hand when he approached Ms. Battisti, the DNA results demonstrating that Plaintiff was "excluded as a DNA match" for the

gloves, and the testing which showed that the marks on the screwdriver were not a match to any of Plaintiff's tools. (Pl.'s Opp. at 26.) Plaintiff also focuses on the discovery of grinding tools in Gersbeck's car and the failure to forward the tools for testing, as well as the failure to follow-up regarding the threatening video of Gersbeck's family and Gersbeck's statements in the Belle Letter. (Pl.'s Opp. at 26-27.) Plaintiff contends that, although these facts may not be enough to show a dissipation of probable cause on their own, these facts taken together raise an issue of fact sufficient to defeat summary judgment. (Pl.'s Opp. at 27.)

To sustain a section 1983 malicious prosecution claim, plaintiff must show "a violation of his rights under the Fourth Amendment" and establish "the elements of a malicious prosecution claim under state law." <u>Manganiello v. City of N.Y.</u>, 612 F.3d 149, 161 (2d Cir. 2010) (internal citations omitted). "[U]nder New York law, a plaintiff must prove: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." <u>Id.</u> (internal quotation

marks and citations omitted); see also Colon v. City of N.Y., 60 N.Y.2d 78, 82, 455 N.E.2d 1248, 1250, 468 N.Y.S.2d 453 (1983).

"Although the existence of probable cause must be determined with reference to the facts of each case," Manganiello, 612 F.3d at 161, generally, there is probable cause when "knowledge of facts, actual or apparent, [is] strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." Riccio v. New York, 859 F. Supp. 2d 480, 486 (E.D.N.Y. 2012) (quoting Genia v. N.Y. State Troopers, No. 03-CV-0870, 2007 WL 869594, at *12 (E.D.N.Y. Mar. 20, 2007)). In New York, "the existence of probable cause is a complete defense to a claim of malicious prosecution . . . . " Savino v. City of N.Y., 331 F.3d 63, 72 (2d Cir. 2003). Moreover, "indictment by a grand jury creates a presumption of probable cause that may only be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" Savino, 331 F.3d at 72 (quoting Colon, 60 N.Y.2d at 83, 455 N.E.2d at 1251) (emphasis in original)). See also Bernard v. United States, 25 F.3d 98, 104 (2d Cir. 1994). Plaintiff "bears the burden of proof in rebutting the presumption, and he must do so with more than mere conjecture and surmise that his indictment was procured as a result of conduct undertaken by the defendants in bad faith." Reid v. City of N.Y., 00-CV-5164, 2004 WL 626228, at

*7 (S.D.N.Y. Mar. 29, 2004), R&R adopted by, 2004 WL 1488194

(S.D.N.Y. July 1, 2004)) (quoting Savino, 331 F.3d at 73) (internal

quotation marks omitted).  Further, the failure to take certain

investigative steps is "not the equivalent of fraud or the

suppression of evidence."  Colon, 60 N.Y. 2d at 78, 468 N.Y.S.2d

at 456, 455 N.E.2d 1248.

　　　　The Second Circuit has held that "even when probable

cause is present at the time of the arrest, evidence could later

surface which would eliminate that probable cause."  Lowth v. Town

of Cheektowaga, 82 F.3d 563, 571 (2d Cir. 1996) (quoting Cox v.

Cty. of Suffolk, 780 F. Supp. 103, 108 (E.D.N.Y. 1991)).  However,

"'[i]n order for probable cause to dissipate, the groundless nature

of the charges must be made apparent by the discovery of some

intervening fact.'"  Fappiano v. City of N.Y., No. 01-CV-2476,

2015 WL 94190, at *13 (E.D.N.Y. Jan. 7, 2015), aff'd 640 F. App'x

115 (2d Cir. 2016) (quoting Lowth, 82 F.3d at 571).

　　A.　　Initiation or Continuation of a Criminal Proceeding

　　　　As a preliminary matter, the County Defendants argue

that Plaintiff cannot establish that Sergeant Galgano or Detective

Gaertner initiated or continued a criminal proceeding against

Plaintiff.[12]  (Defs.' Br. at 17-18.)  The Court agrees.  "[T]here

---

[12] Plaintiff does not respond to this argument, instead
contending that the County Defendants (collectively) "commenced
a criminal proceeding (in this case the Grand Jury presentation)
against Plaintiff."  (Pl.'s Opp. at 20.)

is a presumption that a prosecutor exercises independent judgment in bringing a criminal case, thereby breaking any chain of causation between a police officer's conduct and the initiation of the proceeding." Stukes, 2015 WL 1246542, at *9. To demonstrate initiation, "'a defendant must do more than report the crime or give testimony[, h]e must play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'" Id. (quoting Manganiello, 612 F.3d at 163). In addition, initiation can be demonstrated with evidence showing that the defendant "fil[ed] the charges[,] . . . prepar[ed an] alleged false confession and forward[ed] it to prosecutors," Manganiello, 612 F.3d at 163, (internal quotation marks and citation omitted) "with[held] material exculpatory evidence from the prosecutor or knowingly created false information that creat[ed] the basis for the prosecution." Stukes, 2015 WL 1246542, at *9.

Sergeant Galgano's role in the investigation was limited to executing search warrants and assisting with Plaintiff's arrest. (Defs.' Br. at 12.) Detective Gaertner was the primary detective investigating this incident; however, after the NCDAO took over the investigation, he assisted the NCDAO with questions and corroborated certain information in advance of the grand jury. (Defs.' Br. at 12-13.) There is no evidence that either officer importuned ADA Canty to prosecute Plaintiff or that either officer

fabricated or withheld evidence from ADA Canty.  <u>See</u>, <u>e.g.</u>, <u>Stukes</u>,
2015 WL 1246542, at *9 ("No facts are alleged that would permit an
inference that Miller pressured or importuned A.D.A. Marshall to
bring charges against Plaintiff . . . Additionally, . . . Plaintiff
has failed to plead sufficient facts to allege that the Defendants
knowingly forwarded false evidence to the D.A.'s Office, or that
they improperly withheld material exculpatory evidence.");
<u>Sargent</u>, 2007 WL 778437, at *8 ("Here there is no evidence that
Heimbauer or the other two individual police officer defendants
failed to disclose facts or misrepresented or falsified
evidence.").  Therefore, the malicious prosecution claims against
Sergeant Galgano and Detective Gaertner are DISMISSED.

B.   <u>Lack of Probable Cause</u>

As to the remaining claims against ADA Canty and ADA
Kelly, to defeat summary judgment, Plaintiff must either (1)
demonstrate a genuine issue of material fact that the indictment
was procured by bad faith or fraudulent conduct, or (2) demonstrate
a genuine issue of material fact that probable cause dissipated
between the indictment and trial.

1.   <u>Rebutting the Presumption of Probable Cause</u>

The Court finds that Plaintiff is unable to rebut the
presumption of probable cause because he has failed to show
evidence of "fraud, perjury, the suppression of evidence or other
police conduct undertaken in bad faith."  <u>See</u> <u>Savino</u>, 331 F.3d at

72 (internal quotation marks and citation omitted). Plaintiff relies on unsupported allegations that: (1) "multiple versions of Gersbeck's testimony put Defendants on notice that Gersbeck was not telling the truth," (2) "Canty knew that [Gersbeck] had materially changed his story" and (3) "the Belle Letter . . . constitutes exculpatory evidence which should have been disclosed . . . to the Grand Jury." (Pl.'s Opp. at 22-23.) However, these conclusory allegations are not sufficient to overcome the presumption of probable cause resulting from a grand jury indictment. See, e.g., Stukes, 2015 WL 1246542, at *6 ("Although Plaintiff attempts to rebut the presumption of probable cause by alleging that the A.D.A. presented 'false-facts' to the grand jury, and that Defendants failed to turn over exculpatory evidence . . . for presentation to the grand jury, these conclusory statements fail to overcome the presumption of probable cause.") (internal quotation marks and citations omitted); Montes v. King, No. 00-CV-4707, 2002 WL 1808209, at *3 n. 5 (S.D.N.Y. Aug. 6, 2002) (holding that "unsubstantiated speculation" that an officer acted in bad faith was not sufficient to defeat summary judgment); cf. Reid, 2004 WL 626228, at *7-8 (holding that plaintiff had raised disputed issues of fact to rebut the presumption of probable cause because witness testified at trial that he lied at grand jury after detective encouraged him to identify plaintiff). There is no evidence that fraud, perjury, or bad faith conduct occurred or

that ADA Canty was aware of or engaged in any such conduct.
Further, there is no evidence that ADA Canty knew that any evidence
presented to the grand jury (including Gersbeck's testimony) was
false.[13]  Although there were differences in Gersbeck's accounts,
this fact on its own is not enough to demonstrate that the
indictment was obtained as a result of fraud, perjury, suppression
of evidence, or other bad faith conduct.  As the County Defendants
point out, many facts in Gersbeck's accounts were independently
corroborated.  (Defs.' Br. at 20-21.)

        Plaintiff argues that ADA Canty's failure to present the
Belle Letter to the grand jury constitutes sufficient evidence to
overcome the presumption of probable cause.  (Pl.'s Opp. at 21.)
The Court recognizes that the parties dispute when ADA Canty
learned about the content of Belle Letter.  Nevertheless, even
assuming arguendo that ADA Canty knew about the Belle Letter prior
to the grand jury, he was not obligated to present it and his
decision not to present the letter is not sufficient to overcome
the presumption of probable cause.  See, e.g., Savino, 331 F.3d
at 75 ("ADA Sullivan—-who had the discretion and authority to

---

[13] Plaintiff argues that "District Courts have denied motions for
summary judgment on Malicious Prosecution claims when there is
evidence that the prosecution proffered testimony from a witness
who the prosecutor and/or police knew had been lying."  (Pl.'s
Opp. at 21.)  Although this may be true as a general
proposition, Plaintiff has failed to show any evidence that ADA
Canty, ADA Kelly, or the two detectives knew that Gersbeck was
lying.

decide what evidence to present to the grand jury—-was under no duty to present every item of arguably exculpatory evidence in seeking an indictment. Accordingly, even if we assume . . . that ADA Sullivan was made aware of [the officer's] observations, his decision not to present this information to the grand jury would not amount to conduct undertaken in bad faith.") (citations omitted); Stukes, 2015 WL 1246542, at *5 ("'[T]he simple act of not disclosing to the grand jury all evidence that could potentially benefit the accused at a grand jury hearing does not necessarily rise to the level of bad faith.'") (quoting Parisi v. Suffolk Cty., No. 04-CV-2187, 2009 WL 4405488, at *10 (E.D.N.Y. Nov. 30, 2009).

### 2. Dissipation of Probable Cause

The Court also finds that Plaintiff has not raised a material issue of fact related to the dissipation of probable cause. The grand jury voted to indict Plaintiff on September 3, 2009, and the trial was conducted from May 17, 2010 to June 7, 2010. (Defs.' 56.1 Stmt. ¶¶ 190, 234.) The appropriate inquiry is whether facts arose between September 2009 and May 2010 that clearly demonstrated "the groundless nature of the charges." Fappiano, 2015 WL 94190, at *13.

Plaintiff relies on two facts that came to light prior to the indictment: (1) Gersbeck's admission in February 2009 that he had the screwdriver in his hand during the attack, (Defs.' 56.1

Stmt. ¶¶ 133, 138) and (2) DNA testing completed in March 2009 that excluded Plaintiff as a source of the DNA on the gloves. (Defs.' 56.1 Stmt. ¶ 154; Pl.'s 56.1 Counterstmt. ¶ 154; Feb. 16, 2009 Police Dep't Rep. at 5.) Neither of these facts can be considered because they occurred before the presumption of probable cause arose. See Sargent, 2007 WL 778437, at *9 (analyzing only the "information that came to light subsequent to the grand jury indictment" to determine if that information vitiated probable cause).

Plaintiff argues that ATF testing completed in March 2010--which showed that the marks on the handle of the screwdriver were not a match to any of Plaintiff's tools--destroyed probable cause. (Pl.'s Opp. at 26; Defs.' 56.1 Stmt. ¶ 174.) Although the impressions on the handle did not match any of Plaintiff's tools, ATF was unable to determine if any of Plaintiff's tools sharpened the screwdriver. (Defs.' 56.1 Stmt. ¶ 212; Defs.' 56.1 Counterstmt. ¶ 271.) As the County Defendants point out, the tool that sharpened the screwdriver left "no toolmarks for comparison" and as a result, those marks could not be matched to any tool—-not just Plaintiff's. (Defs.' 56.1 Stmt. ¶ 212; Defs.' 56.1 Counterstmt. ¶ 271.) The results of ATF's testing merely illustrate that the authorities would never be able to determine the particular tool that was used to alter the screwdriver; they

do not demonstrate that the charges against Plaintiff were groundless.

Plaintiff further argues that the failure to follow-up on the video of Gersbeck's family and his contradictory statements in the Belle Letter support the dissipation theory and that "other evidence which could have served to corroborate Gersbeck's story or exonerate the Plaintiff w[as] never pursued." (Pl.'s Opp. at 26.) However, "the police are not obligated to pursue every lead that may yield evidence beneficial to the accused." Parisi, 2009 WL 4405488, at *11 (quoting Gisondi v. Town of Harrison, 72 N.Y.2d 280, 285, 528 N.E.2d 157, 160, 532 N.Y.S.2d 234 (1988)). Moreover, Plaintiff's criticisms of the investigation do not amount to an intervening fact that rendered the charges groundless.

Finally, Plaintiff contends that the discovery of the grinder in Gersbeck's vehicle destroyed probable cause and faults the County Defendants for failing to submit the grinder for comparison testing. (Pl.'s Opp. at 27-28; Pl.'s 56.1 Counterstmt. ¶ 271.) However, the discovery of the grinder in Gersbeck's car, standing alone, is not sufficient to establish that probable cause dissipated before Plaintiff's trial. See, e.g., Parisi, 2009 WL 4405488, at *11 (holding that defendant's demeanor on surveillance video and inconsistencies in victim's statements failed to "establish the existence of material disputed fact that the prosecution was groundless"); Sargent, 2007 WL 778437, at *9

(holding that statement by victim's ex-boyfriend that he caused injuries to victim after plaintiffs were arrested for assault did not vitiate probable cause). Because of the lack of tool marks, it was impossible to determine if the grinder in Gersbeck's car was used to sharpen the screwdriver. (Defs.' 56.1 Counterstmt. ¶ 271.) Without that determination, the presence of the grinder in Gersbeck's car is not inconsistent with his statements or the prosecution's theory that Plaintiff hired Gersbeck to kill his wife, especially in light of all of the other corroborating evidence. See, e.g., Fappiano, 2015 WL 94190, at *14 (holding that probable cause did not dissipate after prosecutors received negative serology results including because the results were "entirely consistent with the prosecution's theory"). Moreover, this Court declines to find that probable cause dissipated based on "arguably exculpatory evidence." See Parisi, 2009 WL 4405488, at 11 ("[I]t is difficult to imagine how any criminal defendant could ever be constitutionally prosecuted if mere knowledge of arguably exculpatory evidence alone were sufficient to dissipate probable cause.").

Because Plaintiff cannot demonstrate a genuine issue of fact that the prosecution lacked probable cause, the remaining claims against ADA Canty and ADA Kelly are DISMISSED.[14]

---

[14] Because Plaintiff's underlying claims are without merit, it

<u>CONCLUSION</u>

The County Defendants' motion for summary judgment (Docket Entry 52) is GRANTED and Plaintiff's claims are DISMISSED WITH PREJUDICE.  To the extent the County Defendants' cross-claims against Gersbeck relate to the claims dismissed herein, their cross-claims are also DISMISSED WITH PREJUDICE.  Additionally, Plaintiff's claim against Gersbeck is DISMISSED WITH PREJUDICE. The Clerk of the Court is directed to enter judgment accordingly and mark this case CLOSED.


SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.


Dated:     January   9  , 2017
           Central Islip, New York

---

is unnecessary for the Court to determine whether the County Defendants are entitled to absolute or qualified immunity.